Your Honors. May it please the Court. I would like to reserve two minutes for rebuttal. The issues before this Court are relatively simple, I think. The first is whether Plaintiff presented enough evidence that Deputy Young conducted a path search in a constitutionally appropriate, safe manner when it resulted in Ms. Harding's disfigurement. The next is any attendant arguments of qualified immunity and the Monell claims and negligence under various laws. Roberts. There's no doubt this was an accident, right? Harding. There's no doubt that this was an accident. Harding. There's no — I do not believe that Ms. Young intended to cut Ms. Harding's finger off. I think that she acted — I take it that you agree it was an accident. Why are you fighting us with that? We all know it's an accident. Yeah, I mean, an accident in which there was no malicious intent. Right. Now, my next question is, once the accident happened and they tried to get her to the hospital, tell us about why there was excessive force there. The — the — Ms. Harding's finger had been severed. She was — had the end of one finger in one hand, and she was holding — applying pressure with that hand — with her hand onto the very painful finger when Deputy Morris attempted to shackle her, putting her hand with the finger against her waist so she couldn't move it, and the other hand on her waist so she couldn't hold the finger as she had been directed, hold the finger, applying pressure, and she couldn't, and the pain was excruciating. At what point is it inappropriate for an officer to start — to shackle a defendant when the whole hand is gone? You know, at what point do we stop? Obviously, she was bleeding profusely. Obviously, her finger was — the end of her finger was in her other hand, and she was applying pressure. Why was it necessary to shackle her to her waist and to struggle with her hands in — in posing even more pain in order to do so? Until his supervisor came along and said, stop. Ms. Green, doesn't the record reflect that took a few seconds? As soon as they — The record — The — the — the jail's procedures require shackling moving to a hospital, right? Yeah, but the jail — That's the first step, right? The jail procedures — The officer was attempting to comply with that standard. Yes. When she cried out, it's painful, it hurts, the supervisor says it's not necessary to shackle that hand, the left hand, and the officer stopped. Well, shackling is — is a jail procedure when it's necessary to transport someone. Yes. However — Was my description fairly accurate, though? It was — it was fair and accurate. However, there is — there is the — the idea, the constitutional protection from excessive force, that when you see that what you're doing is going to impose so much pain against — on an inmate, that you stop and you ensure that the medical condition is cared for. There wasn't a — a need, a — a correctional need in order to have her shackled. It's your position that this exceeds what's allowed by the Constitution. Okay. It's excessive as it becomes a constitutional violation, not necessarily that it was an assault, because you've got your State claims and you've got your Federal claims. Yes. With regard to the negligence claim against Officer Young, Deputy Young, what exactly do you claim and what does the record support that Officer — or Deputy Young did? My reading of the records suggests that she told your client to raise her hand so that she could be patted down as — as Deputy Young pat down the first-person in line, and that your client put her hand in the jam of the doorway so that — which she knew closed incorrectly, I guess. And she placed her hand there. She was — there's nothing in the record that suggests that Deputy Young knew or required her to place her hand in the jam where it was hit. Well, there is record. There — in the record is Ms. Geisweit testifying that there wasn't enough room up there, that people were crowding up, and that people were — that Sherry was being pushed into a place where there was no window left in order to assume the position for a pat search. Ms. Geisweit — But that's — that's kind of revising the transcript. No, I don't think so. The testimony, as I read the transcripts and the affidavits, is that she was told to raise her hand so she could be patted down. Not that she had to place herself in any particular position. I think Ms. Geisweit testified that — first of all, Ms. Harding testified. Question, why did you put your hand on the doorframe? Answer, because I was told to by the deputy that was pat-searching me. She said, put your hands up so I can pat-search you, and that is where she stood me. That's where I put up my hands. She stood me at the front of the door and said, put up your hands. Geisweit testified that there were so many people there. Let's go back to your client's testimony. Put up your hands. That's what she said. Right. Turn around, as the record shows. Lean against the glass. No, no, no. There's not just lean against the wall. It's put up your hands. Oh, Ms. Young, Deputy Young, testified that the manner in which she conducts her pat-search in this particular situation, as well, was to turn the prisoners against the wall and hold the prisoner with her hand on her back so the prisoner couldn't move, so that she was in control of the prisoner the entire time. So she — and the door slammed from the right. The prisoner couldn't see the door coming. Deputy Young could. And Deputy Young had the prisoner standing there where the prisoner couldn't move because, as Deputy Young testified, she had her under control. She had — she kept her so she could not move. The Geisweit testified that there was no place to go except in front of the door, that they were stacking up, piling up. Sixty women were where — were on a platform, pushing — pushing away, and that there was no place to go. I think Ms. Geisweit testified there was no glass left for Ms. Harding to put her hand up. So, yes, it is an — here we have a situation where the officer is in complete control, the inmate is — has no room to move even if she could, and the officer held her in position. The Deputy Young testified she held her in position. She puts a hand on the back to ensure that the inmate can't squirm or move away. And that's what she did. I see that the Court is not — I just have a different view of the record. You seem to be embellishing on it. And even that, isn't the bottom line is that your client placed her hand where she chose to place it, that no one told her to place it in that particular place, that she put it in the door jam? I don't think that any of us who work at the courthouse and see people get path-searched ever see that the person getting path-searched has a choice as to where to be path-searched, how to be path-searched, which is exactly why Lieutenant Khabibi said you never do it in an area that's so — that's dangerous or close enough to a door jam that the person's hand can be there. You are not in control. If — if you, the prisoner, were in control of yourself during the path-search, the path-search would be an incompetent path-search. They have to be in control. Okay. Thank you very much. Thank you. Good morning. Good morning, Your Honor. Could you pull the mic up a little bit, please? Yes, sir. May it please the Court, my name is Newton Oldfather. I work for the San Francisco City Attorney's Office and I'm counsel for appellees in this matter. The Court is exactly right. This is a very unfortunate accident, but the facts in the record do not establish liability, either under the 14th Amendment or under state negligence law for any of these individual deputies, Deputy Young, Morris, or Cook. I'm going to start with Deputy Young and I want to clarify for the Court some of the issues with the records. We know exactly what the record shows. The proper way to analyze the claims against Deputy Young are through the 14th Amendment Deliberate Indifference Standard. Because Deputy Young was not the person who actually harmed Appellant and Appellant claims it was the door that harmed her, the claim is viewed as a failure to protect claim, which means that plaintiff must show that the door posed an unreasonable risk of substantial harm and that Deputy Young knew about the risk of harm, considered it, and disregarded it. Let me skip ahead to after the accident. She's on the gurney being transported to, getting ready to be transported to the hospital. Okay? As I understand it, everybody knows she just had a traumatic amputation of her finger, part of her finger. Her evidence is that, notwithstanding that, they tugged on her arm to try to handcuff her while she was protecting the injury. Given that this is summary judgment motion, why doesn't that present a jury question of whether it was excessive or not to yank on her arm to try to handcuff her, given the nature of her injury? Well, first let me say I don't believe the excessive force standard is the right standard to use. I think this is a deliberate indifference case for Deputy Morris as well, and it would be viewed as a deliberate indifference to her medical care. She has an excessive force claim? She does have an excessive force claim. So why should we ignore that? The district court said, and I agree, that when you look at the facts, it doesn't seem like a force case of using force and causing the person injury. Okay. But, I mean, that may be the way it comes out. But why, for summary judgment, doesn't she have enough to survive summary judgment on that? She says someone's tugging on her arm after she just had her finger amputated. Even if we use an excessive force standard, and the standard is viewed under White Roper, which shows that the government actors in a jail have a government interest in restoring order and maintaining discipline. Okay. Was she a rowdy person? Does the evidence show she was fighting them or rowdy? There is no evidence that she was fighting anyone, but jail procedures show that when a prisoner moves outside the facility, they have to be restrained if they're a certain classification level. That's for the safety of the medical staff. When they get to the hospital, it's for the safety of the jail. Do those regulations supersede the constitutional limits on force? Of course not, Your Honor. Okay. So she says, I've just had my finger caught in a door, cut off part of my finger. She's holding her hand. They say they're tugging on her arm. For summary judgment purposes, why doesn't she get a trial on that? She doesn't get a trial on that because the only evidence is that Deputy Morris' attempt to put a cuff on her wrist lasted one to two seconds and was motivated and designed to get her to the jail as fast as possible so she could receive medical care. If anything, even to the hospital. Yes, I'm sorry. If anything, Deputy Morris is entitled to qualified immunity in that he what he did was a good-faith effort to get her medical care. And when, as soon as he knew that he didn't need to restrain her, after one or two seconds, as you pointed out, he stopped and he let her be, he let her move to go to the hospital without restraints. I don't even think it meets the negligence standard for Deputy Morris because of his reasonable effort in even attempting to put the cuff on her wrist. He testified that he never touches her finger. He never touches her hand. He touches her arm. He touches the right part of her arm. Her arm's connected to the hand. That's correct. It's connected to the finger, right? Right. But he's doing his best to avoid any injury that plaintiffs can see she has. And there is no evidence in the record about what Deputy Morris knew when he was approaching this situation. The only evidence in the record is that Deputy Morris was responsible for getting her to the hospital. And as Deputy Morris knows, to get a prisoner to the hospital, he needs to put risk restraints on her. Is there evidence that she suffered an additional injury as a result of the attempt to put the handcuffs on? No. Plaintiff claims that she exclaimed out in pain and asked him to stop, at which point the captain came over and said, you can transport her without restraints, and he stopped. And there's no evidence that there's any kind of injury or that her finger needed additional medical care or anything beyond that. I'd like to go back to Deputy Young for a second and address some of the crowding issues that were raised in the argument and who said what to who when they went up to the doorjamb. Deputy Young ordered about 15 to 20 people up into the area. That's the class that was going into the classroom that day. It wasn't 60 people. It was 60 people total in all three classes, but we're only talking about 20. And she ordered them up to the area, said to the entire group, line up. She said to the entire group, put your hands in the air. At no time did she tell plaintiff to put your hands on the doorjamb or put your hands on the wall. In Appellant's argument, she referenced Appellant's declaration in which she does say, Deputy Young told me to put my hands on the doorjamb. In the district court, the court looked at that and struck it from the record because it conflicted with her deposition testimony in which she said, Deputy Young did not give me any individual order. She didn't give me, tell me where to stand. She didn't tell me where to move. The only order I received was to put my hands up. And then you ask a question again about the excessive force and how this relates to California battery law. Do I understand correctly that in California, a state excessive force claim would be brought as a battery claim? Is that right? My understanding is that a reasonable force would be a defense to a battery claim, yes. Robertson So, and again, this is just hypothetical. If we were to conclude that she has enough to get by summary judgment on the Federal excessive force claim, she would necessarily also survive the state battery claim as well. Is that right? They're coextensive. Gannon I don't think the claim is coextensive. I think the affirmative defense of reasonable force, which is available to deputies and peace officers in California, is coextensive with whether or not it's reasonable. But I still think under California law for a battery, there has to be some intent to harm before you even get to the affirmative defense of reasonable force. Robertson Okay. Gannon And I don't believe there's any intent to harm from Deputy Morris. He's stopped. Robertson So at least in your view it's theoretically possible, not saying it would necessarily work here in this case, but it's theoretically possible to have a Federal excessive force claim go to a jury but throw out the state battery claim. Gannon I think a Federal excessive force claim under the Fourth Amendment, yes. I think the Fourteenth Amendment, no. And I think this excessive force claim is under the Fourteenth Amendment, and it's a different standard. It could be because it accounts for the nature of the injury. It accounts for the interest in using the force. And it accounts for the reasonableness of the intrusion as the overarching theme, and with deference to a jail official's need to maintain security and order in the jail and do his job. So I think if you are under an excessive force Fourteenth Amendment analysis, then the answer to your question is no. I don't think the answer is you cannot maintain a battery. You can't have a Fourteenth Amendment excessive force claim and a state claim. I think they're coextensive in that once you don't have that Fourteenth Amendment excessive force claim, you don't have the battery claim because they both rely on some kind of the converse is if she has an excessive force claim, she would also have a state battery claim. Well, I think the Fourteenth Amendment excessive force claim requires an intent to punish in the end. Because it's a due process claim, the jailer has to be shown an intent to punish. So because intent is also part of the battery claim, and Deputy Morris here has not even close to intent to punish, but is only trying to render medical care, we don't get close to having either claim. Okay. And the Fourth Amendment claim with respect to the manacling, what do you say? I'm sorry, Your Honor. I couldn't hear you. The Fourth Amendment claim that what they did was unreasonable seizure. What is the standard there? Does it differ? If you're talking about a Fourth Amendment excessive force claim, then yes, the standard would differ. But the Fourth Amendment excessive force claim doesn't apply because of the Pierce v. O'Mahollan case. I don't know how to pronounce it. Which said that the Fourth Amendment protections for excessive force apply up until the time of arraignment. Up until the time of arraignment. Once the prisoner is arraigned, they are no longer a pretrial detainee under Goley and Lipson cases of Fourth Amendment excessive force protections, and you are in a Fourteenth Amendment due process excessive force analysis. There is some discussion about whether or not the pat-down search is even reasonable under the Fourth Amendment at all. That would survive because there continue to be Fourth Amendment protections. I think it's undisputed that deputies can conduct pat-down searches in jails to check for contraband and drugs. Thank you very much, Mr. McLaughlin. Thank you very much. Ms. Green, you had a little shy of two minutes left. I would just like to address a couple of issues. As to Deputy Morris, counsel maintains that he was unaware of the problem, but that belies the facts where the woman is holding her finger in a bowl in one hand and holding on to the stub of the finger in the other. He was well aware of what happened. And the shackling would have prevented her from being able to even provide the pressure that was alleviating the significant pain because he was shackling her hands next to her waist. Okay. But you know his point is whether he did it the best possible way is debatable. But he wasn't trying to hurt her. He wasn't mad at her. He wasn't fighting with her in the street. He's trying to get her to the hospital and he's trying to comply with their standard procedures. Ms. Harding testified that he was struggling with her as she was screaming, please don't, please don't, and there a struggle ensued, so he Please don't, please don't. And then he didn't, right? He stopped. Oh, not immediately. And she Is there a conflict here as to how long? Yes. And what is that conflict? Ms. Harding testified that she screamed a number of times, please stop, please stop, and that it wasn't until she didn't have a time frame, she was in trauma, but it wasn't until the captain came by to tell him to stop that he would stop and that a struggle did ensue. He testifies that I think he said that it was about five seconds. I could be wrong about that. But it wasn't one or two seconds. She was screaming, and she screamed repeatedly, asking to please not be shackled. And in her testimony, she exhibited, demonstrated the excruciating pain that caused her and the fear. And the medical records, well, we don't know what acts contributed to what thing, but they had serious issues reattaching the finger. It was, it had to have multiple, you know, things and stitches and stuff done to it. So, you know, she goes to the hospital, they put it, they put on the finger, but it was a very, it was a difficult transition. Thank you very much. Thank you. Thank you. Mr. Robata, thank you. The case just argued is submitted.
judges: Huck, Schroeder, Silverman